RAYMOND D. SCHILD, ISB No. 3937
THE BOISE LAW FIRM, PLLC.
2484 N. Stokesberry Pl., Ste. 100
Meridian, ID 83646
Telephone: (208) 336-1145
Facsimile: (208) 888-2338
Email: ray@boiseattorney.com

Attorneys for Plaintiff BYRON DOUGLAS LeCOMTE

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF IDAHO

| | |
|---|---|
| BYRON DOUGLAS LeCOMTE,<br>      Plaintiff,<br>vs.<br>DAWN MARIE LeCOMTE and WADE LeROUX,<br>      Defendants. | Case No. 1:20-cv-14<br><br>COMPLAINT |

COMES NOW the Plaintiff, BYRON DOUGLAS LeCOMTE, by and through his attorney of record, Raymond D. Schild of the firm THE BOISE LAW FIRM, PLLC, and complains and alleges against the Defendants WADE LeROUX and DAWN MARIE LeCOMTE, as follows:

**PARTIES.**

1. BYRON DOUGLAS LeCOMTE (hereinafter "Byron") is now and has been a resident of the State of Idaho, County of Canyon. DAWN MARIE LeCOMTE (hereinafter "Dawn") and WADE LeROUX (hereinafter "Wade") are and have been, on information and belief, residents of the State of Washington, County of Whatcom, residing at 2230 Cornerstone Lane, Unit 408, Bellingham, WA 98226. Dawn and Wade may be referred to collectively as "Defendants".

**JURISDICTION and VENUE**

**Original Subject Matter Jurisdiction.**

2. This Court has original subject matter jurisdiction based on diversity of citizenship, pursuant to 28 U. S. Code, section 1332(a). This action is between citizens of different states, Plaintiff being a citizen of Idaho and Defendants being citizens of Washington. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

**Personal Jurisdiction**

3. This Court has personal jurisdiction over Defendants pursuant to FRCP 4(k) (1) (A), in that they are subject to personal jurisdiction of a Court of general jurisdiction of the State of Idaho. Pursuant to Section 5-504, Idaho Code, Dawn and Wade are subject to Idaho jurisdiction by virtue of this action arising out of him and her having done one or more of the following acts in the State of Idaho:

   a. The transaction of any business within this state which is hereby defined as the doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance the business purpose or objective or any part thereof of such person, firm, company, association or corporation;
   b. The commission of a tortious act within this state;
   c. The ownership, use or possession of any real property situate within this state; or,
   **d.** The maintenance within this state of matrimonial domicile, out of which this action arises.

   Wade is further subject to Idaho jurisdiction by virtue of this action arising out of his having conspired, aided, abetted, participated in, approving, ratifying and/or acting jointly and in concert with Dawn in her having done one or more of the foregoing acts in the State of Idaho.

**Venue**

4. Venue is proper in this District pursuant to 28 U. S. Code, section 1391(b) (2), in that this District is the District in which a substantial part of the events or omissions giving rise to

the claim occurred, or a substantial part of property that is the subject of the action is situated.

**FACTUAL ALLEGATIONS**

5. Byron and Dawn were married at Valley of Fire, Nevada, on December 24, 2003. Prior to the marriage, Byron had accumulated substantial separate property, including the majority of his retirement account, and

6. Byron was a pilot for a charter company and Dawn was a teacher in Nevada. They moved to Montana in about 2007.

    They moved to Blaine in about 2016 to a rental home and then were thinking of moving to Boise, Idaho. Dawn made no mention of having any issues with their relationship and Byron thought things were fine between them. They planned to go to Boise to look at homes. When Byron arrived at their rental home on January 7, Dawn's belongings were packed, with a note on the kitchen table saying she was leaving him. He was stunned. That day, he was served with a divorce suit in Washington. He was devastated and tried to call her but she would not answer.

7. On January 8, he learned from credit card charges that she stayed at a local motel and flew from Bellingham WA to Minneapolis/St. Paul. MN. She stayed with her brother for several weeks.

8. On January 23, Byron was finally able to speak with Dawn, and she agreed to return home and agreed that a trial separation would be preferable than a full divorce. Byron purchased her return flight and picked her up at SeaTac airport.

9. Byron went to Phoenix to research living there as Dawn did not want to live in the area any longer. She said she would stay home and take care of their cat. They found out their rental was being sold and they needed to move out. As Byron had found nothing in

Phoenix, Dawn flew to Boise to look at homes for them in February. She returned with several properties in mind and they settled on one, which Byron then bought.

10. In March, Byron coordinated their move and Dawn decided to stay at a local resort while this all was happening. The parties drove to Idaho on March 8, arriving the next day, staying at a motel and talked about their future.

11. Dawn insisted she not be a co-signer on the loan for the house purchase, stating she wanted to have a separation agreement prepared prior to the closing on the house, in order to "protect herself." But throughout, she reiterated consistently she wanted to live under one roof while they worked things out. Byron believed her, as she was talking and acting as if she wanted to remain married and continue to live with him.

12. On March 18, Byron returned home after an extended flight schedule and Dawn called to say she would not sign as his spouse on the closing papers, though the loan officer and closing agent called her attorney to assure them doing so would not affect her. She continued to refuse, putting the house sale in jeopardy and exposing Byron to being sued.

13. On March 20, Dawn produced separation papers her Washington attorney had prepared. She did so with urgency at the last minute, demanding he immediately sign them. She threatened that if Byron did not agree to the terms demanded she would not cooperate in the sale. She further stated that if he agreed to her terms she would continue to work on the marriage and live together in their new house, but if he did not agree and sign the papers she would walk away from him and the marriage. Byron felt that he had no choice but to sign the papers and in fact had none. He had no attorney. She demanded he decide immediately and sign the papers immediately, so he had no time or opportunity to consult with one. He did not know what his legal rights might be regarding division of assets and

debts, what his separate property was, or whether he should owe spousal maintenance or in what amount or for how long.

14. Dawn assured Byron that the papers she presented and his agreeing to them and signing them would mean nothing, because if he did they would continue to live together, remain married, work out any issues they had and stay together. He believed her and signed the papers, because he trusted what she said, had no alternative, loved her and didn't want to lose her and have her walk away from him.

15. The very next day, March 21, Dawn sent the signed document to her attorney in Bellingham. She finally agreed to sign the closing documents so that the house could be purchased. In only one day, they rushed the separation through the Court before Byron had a chance to rethink things or talk to an attorney. It was finalized March 22 in Whatcom County Superior Court. Later that day, Byron learned that the sale of what he thought was to be their new home had closed.

16. On March 22, they moved into the new home. Dawn decided to use two of the four upstairs rooms for storage, saying that she needed some time to sort through her stuff and decide what to keep and what to discard. Byron did not question her. She talked about what they should do to the back yard for landscaping. She said she might take the summer to re-start her career and obtain a temporary teaching job in the area. Byron was sucked in by what turned out to be her ruse and façade.

17. On April 22, Byron left for a week of flying for his employer. That was the last time he ever saw Dawn On April 27, she canceled her gym membership at the Idaho Fitness Factory. On the 28th, she left Idaho and made her way as far as North Bend, WA to stay the night at a local hotel.

18. On April 29, Byron returned home to find to his shock that Dawn had gone. She left a note that she and the cat were "on an adventure."

19. Later Byron checked the search history on her computer. She had researched some man named "Wade Leroux" numerous times as well as some Astrology sites titled, "Leo and Scorpio are they compatible?" Wade is a Leo and she is a Scorpio.

20. On May 1, Byron reported Dawn missing to the Caldwell, Idaho Police Department. As he was sitting with Officer Hoadley to provide details, Dawn called him. She said she went to Bellingham to pick up her medical records and was driving to her aunt's in Portland. The police would not file a missing persons report and said Dawn probably wouldn't be back. Byron did not want to believe that as he believed Dawn when she assured him and promised they would continue to live together as a married couple and work out any issues with their relationship.

21. On May 1 at approximately 7:30 pm, Dawn called Byron for the last time, saying she and the cat were now at her aunt's. He asked when she would be home and she was vague but did not tell him she was not returning.

22. On May 14, Byron learned from Dawn's aunt that Dawn never did arrive or even call her to ask if she could stay. Dawn has been incommunicado ever since.

23. Thereafter, Byron consulted with an attorney and learned that the house he owned in Nevada at the time Dawn and he were married was his separate property. He used the sales proceeds of that house, which were his separate property, to pay a HELOC he used to buy two lots in Montana, so that the lots were separate property because traceable to his separate property Nevada home. But in the separation agreement, he was coerced and agreed under duress to give Dawn one of the Montana lots because of her false assurances

and because he knew no better because she demanded he agree without consulting an attorney

24. Byron also learned that his Vanguard account was almost solely his separate property as he had started it and contributed and accrued substantial value before Dawn and he were married. The real community interest was only about $500. He has learned substantial other property was or could be his separate property and substantial debts were or could be separate debts of Dawn.

25. He learned that his Charles Schwab/Netjets 401K was substantially his separate property since it was started in January 2003 prior to marriage. But in the separation agreement, he was coerced and agreed under duress to give Dawn half because of her false assurances and because he knew no better because she demanded he agree without consulting an attorney

26. In the separation agreement, Byron was coerced and agreed under duress to give Dawn five years of spousal support at $2,400 per month, because of her false assurances and because he knew no better because she demanded he agree without consulting an attorney. As she had the ability to work as a teacher but voluntarily decided not to work, had marketable skills and earning capacity, he learned he should not have owed her spousal support at all, or if he did it would be for much less monthly and for a much shorter time. He makes about $167,000 per year and Dawn is capable of working as an educator and could make about $80,000 per year as an educator with her experience level. She could make over $100,000 per year as an administrator and she had expressed more than once a desire to move into administration. He learned that if she is able to obtain full-time employment, she likely wasn't entitled to spousal support at all, or at worse for much less and much shorter duration. Without consulting an attorney, which she forbade and which

he was forced to comply in order to keep the marriage together, or so she assured him, he knew no better. And was coerced and misled to induce him to agree, with the further assurance that the terms of the agreement meant nothing and would never take effect.

27. The bottom line is that Byron agreed to exorbitant spousal support and an unequal division of assets and debts under the false assurance that the agreement would never be effectuated and she would stay with him if he signed it. It was the result of fraud, duress and coercion, with forced absence of professional guidance from a lawyer. Dawn even so took the cat "Button" which she had agreed he could keep and which Byron loved dearly.

28. On information and belief, and in hindsight, Plaintiff believes and therefore allege that Dawn had a romantic and/or sexual relationship or was intent on pursuing such a relationship with Wade from the start, during the time she was making false promise and assurances to Byron she would stay with him and work on the marriage to induce him to agree to the separation terms she falsely said would never be enforced, without consulting a lawyer, and that this existing or contemplated relationship was the impetus for her leaving Byron and doing so in the manner described.

29. On information and belief, and in hindsight, Byron believes and therefore alleges that Wade knew of and acted in concert, conspired, participated, encouraged, aided, abetted, acquiesced and otherwise acted jointly with Dawn in her actions, conduct, false statements, knew or should have known of the likely results of the same and their effect on Byron, and is both directly and vicariously liable to Plaintiff as a result of those actions, conduct and false statements.

30. Byron never knew or heard of Wade Gregory LeRoux until April 29th, when he returned from a seven day flight tour and discovered Dawn, before she left and during the time she continued to lead Byron on, had heavily researched this individual on social media as well

as a "Zodiac Compatibility" website, where reference was made to her sign and his being "love" compatible and showing a steamy, sexy photo. Dawn has admitted in court documents that she is living with a "friend" in Whatcom County where Wade lives and has finally admitted to Byron on October 26 that she knows Wade, but evaded questions about the computer searches. Dawn has no other friends, relatives or other contacts than Wade that Byron knows of in Whatcom County. For the 3 years they lived there, all she supposedly did was go to the gym and bookstore to read up to date magazines. Now Byron believes she may have been involved with Wade back then and all along, and they concocted this scheme for her to go to him but to gain substantial money and property to fund their lives together through the scheme. She never mentioned making friends there. Yet now she admits she knows Wade. Other than Wade, Dawn had no one or no place to go back to in Bellingham, and she had always said she "abhorred the people there…their "lack of work ethic" and other traits.

31. Wade bears an odd resemblance to Dawn's late father who passed during her college years- height, weight, business background. Dawn had serious issues with her Dad passing and would go into a deep depression each fall with the anniversary of his death. She often chided Byron, comparing him adversely to her Dad, insulting his average height and build, and called him a "button pusher" to demean how he earned the money she enjoyed and took all she could. Dawn left Idaho with what she could carry in the SUV, with no employment or credit. She needed, or more likely knew she already had in Wade, someone to provide and somewhere to live.

32. Byron believes Dawn and Wade were in a relationship prior to her and Byron ever moving to Idaho. She knew his flight schedule that kept him away from home for substantial periods, and had switched to a "dumb phone", without tracking capability. She often joked

that of the two of them, it was she that held the reigns to having an illicit affair. He believes when she decided to come back from her brother's farm in MN in January, the landlord ousting them took her by surprise, and she hatched her scheme to have Byron on the hook, in love and willing to do anything to keep her, to provide for her long enough to get him to sign the separation agreement and then to take off to enjoy the fruits with Wade. Byron believes Dawn and Wade have or had a romantic, sexual and/or adulterous affair and relationship which destroyed the marriage or facilitated its destruction.

33. Byron believes she moved to Idaho as part of the scheme. With Byron saddled with a home and mortgage in Idaho, she slinked off to Washington to file the separation, later converted to a divorce, as Case Number 19-3-00004-37 in Whatcom County state court. In that case the separation agreement was filed and, contrary to her prior assurances, enforced. She took all the tax refund, the majority of his accounts and retirement, half his MT property and large and lengthy spousal support. She received an unequal division of property and debt in her favor and $13,000 in attorney fees and fines. She was rewarded for her probable cheating on Byron and her scheme to defraud him to do so. She filed in Washington to hamper Byron's ability to fight back in a multi-state battle.
Then, if she wasn't involved with Wade all along, then at the latest then, upon deciding the time was "right" she searched him out and found him, "having already been an acquaintance". If she wasn't already in a relationship, then at latest then she became involved with him.

34. Wade's last known address is 2230 Cornerstone Lane # 408, Bellingham, WA 98226 This dovetails very conveniently with Dawn's bank at 3101 Woburn St., Bellingham WA, her preferred shipping provider and suspected mail box rental (Pak Mail 2950 Newmarket

St. Unit 101, Bellingham 98226) directly across the street Wade's address, her preferred grocer (Haggen's 2900 Woburn ST. 98226) and a long list of her preferred eateries etc.

35. Byron tried to have the WA separation set aside based on fraud in the inducement. Dawn lied again. She in essence admitted she had lulled, cajoled and misled Byron into signing the agreement, promising to stay with him and then leaving, but said she did so because she was afraid of him and trying to placate him, falsely accusing Bryon of domestic physical, emotional or verbal abuse. All of these charges were absolutely false with no evidence to support them. But her allegations were enough to induce the WA Court to uphold the agreement.

36. Byron registered the WA separation order in Idaho and filed an Idaho divorce case in Canyon County, case number CV14-19-6705. Dawn filed a declaration in which she falsely, according to Byron, claimed she was not an Idaho resident, only a visitor, despite the facts that she had maintained an Idaho domicile with Byron, had a gym membership and several other indicia of residency in Idaho. She in that case testified under oath she was a citizen and resident of WA. By this time, the WA Court had decided to uphold the separation agreement and it was in the process of being converted to a divorce as allowed by WA law, so Byron voluntarily dismissed the Idaho action.

37. Dawn going to WA, having a WA separation agreement and Order and litigating the property issues there was, on Byron's information and belief, part of her scheme to defraud him. He found out from his WA attorney that the forum Dawn chose is very liberal and generous with women litigants, awarding larger property divisions and spousal maintenance. He learned that Dawn's suspected adultery, mental cruelty and scheme to fraudulently induce him into signing the separation agreement did him no good in WA because WA law makes such fault by Dawn irrelevant and not considered in property and

spousal maintenance determinations. In Idaho, he learned from his ID counsel, spousal maintenance is limited in amount and duration, is not awarded liberally, and that Dawn's fault is relevant to property, debt and maintenance determinations. He learned in fact that in ID it was very arguable Dawn would have received little or no maintenance and there in fact could have been an unequal distribution of property and debt in Byron's favor. That would have been a swing of the result of hundreds of thousands of dollars in result between the two states. Moreover, he learned that if the divorce had been litigated in ID, there was a reasonable likelihood the separation agreement would not have been enforced under the circumstances of its inducement. Byron believes Dawn learned these things or at least the liberal and generous treatment she was likely to receive under WA law, from her WA attorney or otherwise, and orchestrated the situation to avoid ID courts, have the matters heard in WA courts, and in the process tailor her claims of residency accordingly even if false. But for her false claims as to residency and her fraudulent scheme, Byron believes the result to him would have been hundreds of thousands of dollars more favorable to him than it was in WA courts.

38. Byron has been distraught and devastated mentally and emotionally by these actions and false assurances, enduring and continuing to endure mental and emotional distress, pain and suffering and damage. His trust has been violated. His marriage has been destroyed, one he intended on being permanent with a woman he truly loved. He lost property and his beloved cat. He has suffered unwarranted financial losses in the divorce of hundreds of thousands of dollars. He has incurred enormous attorney fees trying to fight against the results of these actions and false assurances. He has lost what should have been separate property, and the majority of his retirement he has worked for, so hard and for so long.

## CAUSES OF ACTION

### COUNT ONE- INJURY TO PERSONAL AND PROPERTY RIGHTS

39. Plaintiff realleges and incorporates paragraphs 1 through 38 as though fully stated herein.

40. Dawn, and on information and belief Wade, by participation, knew or should have known her conduct, actions and statements would cause injury to Plaintiff's personal and property rights.

41. Said actions and statements intentionally or recklessly, with willful and wanton disregard of known, intended or reasonably knowable consequences, caused injury to Plaintiffs' business, reputation, profits and economic advantage, and personal and property rights in an amount to be proved at trial.

### COUNT TWO- FRAUD

42. Plaintiff realleges and incorporates paragraphs 1 through 41 as though fully stated herein.

43. Dawns statements, including without limitation as to her residency, her intent to stay with Plaintiff and work on the marriage, that the separation agreement would never be enforced or effectuation, and otherwise, on information and belief participated in by Wade, were false and knowingly false when made

44. Dawn, and on information and belief Wade, intended that Plaintiff rely on her false statements.

45. Plaintiff relied on said statements to his detriment and reasonably, and acted on them as if true.

46. Said statements were intended to and did in fact mislead and defraud Plaintiff.

47. Said statements were made with the intent to cause Plaintiff damages, injuries and harm as aforesaid.

48. Said statements proximately caused injury and damages to Plaintiff in an amount to be proved at trial.

## COUNT THREE- CONVERSION

49. Plaintiff realleges and incorporates paragraphs 1 through 48 as though fully stated herein.

50. Dawn's actions and statements, on information and belief participated in by Wade, were for the purpose and caused her to have access to Plaintiff's property, which she succeeded in doing.

51. Dawn, on information and belief participated in by Wade, intentionally took possession of Plaintiff's property and converted the same to her/their own use and benefit, depriving and intending to permanently deprive Plaintiff of said property.

## COUNT FOUR- BREACH OF FIDUCIARY DUTIES

52. Plaintiff realleges and incorporates paragraphs 1 through 51 as though fully stated herein

53. Dawn was in a fiduciary relationship of trust and confidence with Plaintiff.

54. Dawn owed Plaintiff fiduciary duties of loyalty, honesty, good faith, truthfulness and fair dealing.

55. Dawn's actions, statements and conduct, on information and belief participated in by Wade, breached said duties.

56. Said breach of duty proximately caused injury and damage to Plaintiff as aforesaid in an amount to be proved at trial.

## COUNT FIVE- INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

57. Plaintiff realleges and incorporates paragraphs 1 through 56 as though fully stated herein.

58. The conduct of Dawn, on information and belief participated in by Wade, was extreme and outrageous, such as to shock the conscience of a reasonable person.

59. Said conduct was intended to cause emotional distress, or alternatively such emotional distress was so foreseeable that said conduct was engaged in recklessly and with willful disregard of foreseeable damage to Plaintiff.

60. Said conduct proximately caused severe emotional distress to Plaintiff, and injury and damages in an amount to be proved at trial.

## COUNT SIX- UNJUST ENRICHMENT/ EQUITABLE LIEN

61. Plaintiff realleges and incorporates paragraphs 1 through 60 as though fully stated herein.

62. Dawn's conduct, on information and belief participated in by Wade, was wrongful inequitable and unlawful.

63. Said conduct resulted in Dawn and on information and belief Wade to obtain property of Plaintiff and the benefits of said property.

64. Due to the above conduct, she/ they have been enriched unjustly and should not in equity and good conscience be allowed to retain said property and benefits.

65. Due to the foregoing, she/they should be required to disgorge all such property, account for any benefit or other property accruing therefrom, and the Court should order all such property returned, and all such benefits or other property accruing therefrom returned and be subject to an equitable lien in favor of Plaintiff until its return.

## COUNT SEVEN- ESTOPPEL/ PROMISSORY ESTOPPEL

66. Plaintiff realleges and incorporates paragraphs 1 through 65 as though fully stated herein.

67. Based on the foregoing conduct, statements and conduct of Dawn, on information and belief participated in by Wade, equitably should estop her/ them from asserting any position inconsistent with any false statements, assurances, fruits of coercion or duress or fruits of wrongful conduct herein.

## COUNT EIGHT- INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

68. Plaintiff realleges and incorporates paragraphs 1 through 67 as though fully stated herein.

69. Dawn, and on information and belief by his participation, Wade, knew the extent and nature of Plaintiff' property, his earnings, his retirement and the economic advantages enjoyed or expected in the future by him from the same.

70. The actions, statements and conduct aforesaid were intended to deprive Plaintiff of, and interfere with, his prospective economic advantage.

71. The actions, statements and conduct aforesaid did and will continue to deprive Plaintiff of, and interfere with, his prospective economic advantage.

72. The actions, statements and conduct aforesaid proximately caused injury and damages now and in the future, in an amount to be proved at trial.

## COUNT NINE- MISUSE OF PROCESS

73. Plaintiff realleges and incorporates paragraphs 1 through 72 as though fully stated herein.

74. Dawn, on information and belief with participation by Wade, misused legal process, including without limitation the WA separation agreement, the WA separation litigation, the WA divorce litigation and pleadings relating to her residency, for unlawful, fraudulent purposes and by unlawful, fraudulent means, rather than the purposes and by the means for which they are intended and properly used.

75. Such misuse of process was intended to facilitate the obtaining of property and advantages as aforesaid.

76. Such misuse of process resulted in the obtaining of property and advantages as aforesaid.

77. Such misuse of process proximately caused injury and damages as aforesaid to Plaintiff in an amount to be proved at trial.

## COUNT TEN- ALIENATION OF AFFECTION

78. Plaintiff realleges and incorporates paragraphs 1 through 77 as though fully stated herein.

79. On information and belief, Wade knew Dawn was married to Byron.

80. On information and belief Wade participated in the conduct, actions and statements of Dawn.

81. Said conduct, statements and actions destroyed or facilitated in the destruction of the marriage.

82. On information and belief, Wade engaged in, participated in, encouraged or allowed conduct which he intended and/or which he recklessly, willfully disregarded despite it being foreseeably likely to cause the breakdown of the marriage and the relationship between Dawn and Byron.

83. On information and belief, Wade engaged in conduct intended, or which he knew could likely alienate Dawn's affection for Byron and turn such affection to himself, and to destroy or contribute to the destruction of the love, affection and marriage of Dawn and Byron.

84. Said conduct proximately caused injury and damages to Plaintiff.

85. Said conduct proximately caused damages in an amount to be proved at trial.

## RESERVATION OF RIGHTS

86. Plaintiff reserves the right to move to amend this Complaint to state a claim for punitive damages pursuant to applicable provisions of Idaho law.

87. Plaintiff reserves the right to amend this Complaint and to state additional or other claims as discovery of additional facts and evidence may occur.

## ATTORNEY FEES

88. Plaintiff has been forced to incur costs and attorney fees to protect his rights and interests in this matter, which he should be awarded pursuant to Idaho Code sections 12-120 and 12-121, Rule 54, IRCP, all applicable federal statutes or rules of procedure, and any other applicable provisions.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally in an amount in excess of $300,000.00 and/or in an amount to be proved at trial, for costs and attorney fees incurred, and for any such other and further relief the Court deems just.

## JURY DEMAND

Plaintiff demands trial by jury on all issues triable by a jury.

DATED this 7 day of January, 2020.

THE BOISE LAW FIRM, PLLC

By: _____
Raymond D. Schild
Attorneys for Plaintiff

VERIFICATION

State of Idaho        )
                      ) ss
County of Ada         )

Byron Douglas LeComte, being first duly sworn, deposes and states as follows:
I am the Plaintiff in the above matter and have read the Complaint and the same are true and correct to the best of my knowledge, information and belief.

_____
Byron Douglas LeComte

SUBSCRIBED AND SWORN TO BEFORE ME THIS 2 DAY OF January, 2020.

_____
NOTARY PUBLIC FOR IDAHO
RESIDING AT Meridian, ID
MY COMMISSION EXPIRES 10-21-2022